**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Kenis Adalberto Lopez Gonzalez,

Plaintiff,

v.

Markwayne Mullin, *in his official capacity as Secretary of Homeland Security*; U.S. Department of Homeland Security; David Venturella, *in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement*; U.S. Immigration and Customs Enforcement; Todd Blanche, *in his official capacity as Attorney General of the United States*; Marco Rubio, *in his official capacity as Secretary of State*; and Sam Olson, *in his official capacity as Field Office Director, St. Paul Field Office, U.S. Immigration and Customs Enforcement*,

Defendants.

File No. 26-CV-04507 (JMB/DTS)

**ORDER**

---

E. Michelle Drake and Joseph Hashmall, Berger Montague PC, Minneapolis, MN; and Simon Sandoval-Moshenberg (pro hac vice) and Courtney E. Moran (pro hac vice), Murray Osorio PLLC, Fairfax, VA, for Plaintiff Kenis Adalberto Lopez Gonzalez.

David W. Fuller, United States Attorney's Office, Minneapolis, MN; and David R. Hackworthy, U.S. Department of Homeland Security, Minneapolis, MN, for Defendants Markwayne Mullin, U.S. Department of Homeland Security, David Venturella, U.S. Immigration and Customs Enforcement, Todd Blanche, Marco Rubio, and Sam Olson.

---

This matter is before the Court on Plaintiff Kenis Adalberto Lopez Gonzalez's motion for a preliminary injunction. (Doc. No. 7.) Lopez, a Nicaraguan national, asks the Court to issue an order requiring his return to the United States from the Central African

Republic—the third country to which Defendants Markwayne Mullin, U.S. Department of Homeland Security (DHS), David Venturella, U.S. Immigration and Customs Enforcement (ICE), Todd Blanche, Marco Rubio, and Sam Olson removed him in late August 2026. For the reasons explained below, and to avoid irreparable harm, Defendants shall facilitate Lopez's return to the United States, where he shall remain while this matter is pending.

## FINDINGS OF FACT

### A. Order Releasing Lopez

1. On October 30, 2022, Lopez, a then-42-year-old citizen of Nicaragua, entered the United States at the U.S.-Mexico border and immediately turned himself in to U.S. immigration authorities, who detained him.[1] (Doc. No. 1-6 ¶ 1; Doc. No. 20-3.)

2. The following day, on October 31, 2022, immigration officials released Lopez from custody and permitted him to enter the United States. (Doc. No. 1-6 ¶ 1; Doc. No. 20-6 at 2.)

3. After release, Lopez relocated to Minnesota and applied for asylum based on fear of the Nicaraguan government and potential harm to members of his immediate family if he returned to Nicaragua. (Doc. No. 1-6 ¶¶ 1, 2, 29.)

4. In May 2024, Lopez appeared at a scheduled ICE appointment on the understanding that his asylum case would be reviewed at that time. (*Id.* ¶ 2.) He was

[1] In 2005, Lopez was previously issued an order of removal and removed from the United States to Nicaragua. (Doc. No. 1-6 ¶ 1.) He was banned from re-entering the United States for a period of five years. (*Id.*) After Lopez turned himself in on October 30, 2022, DHS reinstated the prior order of removal. (Doc. No. 20-3.)

detained upon arrival at the appointment. (*Id.* ¶ 2; Doc. No. 20-3; Doc. No. 20-5.)

5. In August 2024, an immigration judge (IJ) ordered Lopez removed but granted his request for withholding of removal and issued an order of supervision (OSUP). (Doc. No. 1-6 ¶¶ 2, 4; Doc. No. 1-5 at 2; Doc. No. 20-1.)

6. The IJ entered withholding of removal pursuant to the protections of the Convention Against Torture, which prohibit Lopez's deportation to Nicaragua. (Doc. No. 1-6 ¶ 2.)

7. Both Lopez and DHS waived any appeal of the IJ's order on withholding of removal. (*Id.* ¶ 2; Doc. No. 20-7.)

8. While released on the OSUP, Lopez complied with all conditions of release, including attending scheduled check-in appointments, not traveling outside of Minnesota, not committing any crimes, and not associating with gang members or criminals. (Doc. No. 1-6 ¶ 4; Doc. No. 20-1 at 2–3.)

9. In addition, while released on the OSUP, Lopez resided in Shakopee, Minnesota, where he operated a construction company, attended church, paid his taxes, and obtained a REAL ID Minnesota driver's license. (Doc. No. 1-6 ¶ 3.) He did not commit any criminal offenses. (*Id.*)

**B. January 2026 Detention**

10. In January 2026, federal agents in Minnesota conducted large-scale arrests of non-citizens as part of an immigration enforcement operation targeting residents of Minnesota.

11. On the morning of January 15, Lopez prepared for his workday. (*Id.* ¶ 5.)

However, when he walked outside of his home to warm up his car, eight federal agents in several cars appeared. (*Id.*)

12. Lopez explained to the agents, who wanted to know whether he was a citizen, that he was not a U.S. citizen, but that he had been granted a withholding of removal. (*Id.*) He showed agents the August 2024 order from the IJ that granted him withholding of removal; he also showed agents his work permit, his REAL ID, and his OSUP. (*Id.*)

13. Agents took Lopez's documents, arrested him, and told him that he had to go to Minneapolis and would be deported. (*Id.* ¶¶ 5, 6.)

14. Lopez expressed confusion about a potential deportation—after all, he had a withholding of removal and had complied with all conditions of his OSUP. (*Id.* ¶ 6.) In response, agents told him he was being deported. (*Id.*)

15. Upon arrival in Minneapolis, agents placed restraints on Lopez's ankles, wrists, and waist. (*Id.* ¶ 7.) An ICE officer acknowledged that Lopez's asylum had been "approved," but that he would be sent to El Paso, Texas because ICE was unable to process detainees in Minneapolis at that time. (*Id.*)

16. ICE transported Lopez to El Paso that night. (*Id.* ¶¶ 7, 8.)

17. On his twelfth day of detention in El Paso, he was taken for an interview with agents, who asked him questions and acknowledged that his withholding of removal had been approved. (*Id.* ¶ 9.)

18. Agents also asked him to sign certain documents, which they represented to him were documents showing that he was being detained in El Paso; Lopez refused to sign the documents because they were written in English and he did not understand what they

said. (*Id.* ¶ 10.)

19. Several days later, agents attempted to deport Lopez; when he protested his removal to Nicaragua, agents "proposed" to send him to Mexico. (*Id.* ¶¶ 10, 11.) Lopez declined the proposal because he was not from Mexico. (*Id.* ¶ 11.)

20. Meanwhile, during his time in El Paso, Lopez had access to a telephone for only approximately three minutes every two or three days. (*Id.* ¶ 12.)

21. After twenty-two days in El Paso, ICE transported Lopez to a detention camp facility in Alexandria, Louisiana. (*Id.*)

22. He remained there until, six days later, ICE transferred him to another facility Jackson Parish, Louisiana. (*Id.*)

23. Once at Jackson Parish, Lopez was able to establish regular contact with his family and with counsel. (*Id.*)

24. On April 2, 2026, Lopez's counsel filed a petition for a writ of habeas corpus in the Western District of Louisiana. *See Lopez v. Mullin*, No. 3:26-CV-1049 (TAD/CBW) (W.D. La. 2026).

25. Then, in the middle of the night on August 24, 2026 (while his habeas petition was still pending in the Western District of Louisiana), without prior notice, agents transported Lopez to a detention camp facility in Alvarado, Texas. (Doc. No. 1-6 ¶ 13.)

26. In Alvarado, agents told Lopez he was in "in transit" status and would be moved again in several days. (*Id.*) Agents placed him in a cell with four other men from Nicaragua who also had been granted a withholding of removal. (*Id.*)

27. Lopez spent several days in this cell in Alvarado; he and the others in his cell

(which filled up over the next several days with people from several countries) were not allowed to be near windows, to speak or eat with other detainees in the facility, or make phone calls or use communication devices. (*Id.* ¶ 14.)

28. On the morning of August 28, 2026, when the cell held approximately forty non-citizen detainees, several dozen officers arrived—some in paramilitary gear. (*Id.* ¶ 15.) The officers restrained the detainees by their wrists, waist, and ankles, and took them to a bus, where they waited for several hours. (*Id.*)

29. Hours later, at some point in the afternoon, an agent boarded the bus, told detainees to get off the bus and onto a plane, which would fly them to the Central African Republic. (*Id.* ¶ 16.) This was the first time Lopez learned he would be leaving the United States at all, let alone to a country in Africa. (*See generally id.* ¶¶ 1–16.)

30. Lopez expressed fear of going to the Central African Republic and protested that he had a withholding of removal and a pending habeas case. (*Id.* ¶ 16 ("I insisted that I needed to speak with someone from ICE. . . . I asked [an ICE supervisor] why they were sending us to Africa and told him that I was very afraid to go there.").)

31. Agents laughed at the detainees, who refused to get off the bus as ordered. (*Id.* ¶ 16, 17.)

32. Agents in "military-style uniforms and carrying weapons" boarded the bus. (*Id.* ¶ 17.)

33. Lopez was "desperate" and told officers that he "would rather die there where [his] family was, than be sent to Africa to die." (*Id.*)

34. The ICE supervisor responded it was "not my business," but that if Lopez

wanted to die, "that was what would happen," that "they could kill [Lopez and the others] right there." (*Id.*)

35. Officers then "began shooting at [Lopez and the others] from close range with projectiles," which Lopez believed to be rubber bullets, and other projectiles that "released a white powder that made it difficult for [detainees] to breathe" when they broke against the bus seats. (*Id.* ¶ 18.)

36. Lopez was struck by projectiles several times and developed welts on his legs, chest, and arms. (*Id.* Doc. No. 1-7.)

37. Eventually, the detainees, who were still wearing restraints, were forced off the bus and onto an airplane. (*Id.* ¶¶ 18, 19.)

38. Defendants have placed no documents into the record regarding Lopez's 2026 revocation of release, his arrest, or his detention. At most, an ICE Deportation Officer who was "tasked with reviewing and responding to a request for records regarding [Lopez]" (Doc. No. 20 ¶ 2) submitted seven documents, six of which were generated in 2024. (*See* Doc. Nos. 20-1, 20-3, 20-4, 20-5, 20-6, 20-7.) The sole document generated around, during, or regarding Defendants' 2026 arrest, detention, and removal of Lopez is a Form I-294 Warning to Alien Ordered Removed or Deported, generated on January 26, 2026 by a Deportation Officer in in El Paso. (Doc. No. 20-2.) The document comprises a series of checkboxes, on which an ICE agent is meant to select a period of time a deported non-citizen is prohibited from re-entering the United States and the reason why. (*See id.*) The Deportation Officer checked the box to indicate "[Y]ou are prohibited from entering, attempting to enter, or being in the United States: For a period of 10 years form the date of

your departure from the United States because you have been found:" but checked no other boxes to indicate the purported reason. (*Id.*)

39. Lopez's habeas petition was pending and remained unadjudicated as of the date of Lopez's removal.[2] *Lopez*, 3:26-CV-1049 (TAD/CBW).

40. Lopez was not notified of any reason ICE decided to purportedly revoke his OSUP.[3]

41. ICE did not make any determination that, on account of changed circumstances, there was a significant likelihood that Lopez may be removed in the reasonably foreseeable future.

42. ICE did not promptly conduct any interview regarding the purported revocation of his OSUP at any time after returning to ICE custody on January 15, 2026.

43. ICE did not permit Lopez at any opportunity to submit evidence or information or otherwise respond to the reasons for revocation.

44. ICE did not conduct a custody review or evaluate any contested facts relevant to the revocation.

45. ICE did not make any decision whether the facts as determined after a custody review warrant revocation and denial of release.

---

[2] The mater remained pending until early October 2026, when Judge Terry A. Doughty in the Western District of Louisiana granted Lopez's voluntary motion to dismiss without prejudice. *Id.*, Doc. No. 10.

[3] The record evidence—specifically, the immigration file appended to the declaration of an ICE Deportation Officer—contains no evidence showing that ICE provided Lopez with any reason for taking him into custody. (*See* Doc. No. 20.)

### C. Forced Removal of Lopez to the Central African Republic

46. After flying for two days and stopping briefly in Ghana and Sierra Leone, the airplane landed in the middle of the night in Bangui, the capital city of the Central African Republic. (Doc. No. 1-6 ¶ 22.)

47. The Central African Republic is a land-locked nation in central Africa that, since January 2026, the U.S. Department of State (the agency of which Defendant Rubio is head) has assigned a Level 4 –"Do not travel" travel advisory (the most grave of the Department of State's travel advisories). *Central African Republic*, U.S. DEPARTMENT OF STATE, https://travel.state.gov/en/international-travel/travel-advisories/central-african-republic.html [https://perma.cc/NWS6-BTFC] (last visited October 30, 2026).[4] The Department of State advises against travelling to the Central African Republic "for any reason" "due to risk of unrest, crime, kidnapping, landmines, health, and terrorism," and the threat of "renewed outbreaks of armed conflict." *Id.*

48. The Department of State understands the safety risks to civilians in the Central African Republic to be so high that "[f]amily members cannot join U.S. government employees who work in the Central African Republic." *Id.*

49. In April 2025, the Overseas Security Advisory Council (an agency that acts in partnership with Defendant Rubio's Department) reported that threats to foreigners in Bangui is high and that bouts of civil unrest can interrupt the operations of humanitarian

[4] The Court can take judicial notice of material on government websites. *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 793 (8th Cir. 2016) (taking judicial notice of government website (citation omitted)).

workers in the country, as follows:

> Within Bangui, criminals frequently target foreigners for crimes of opportunity due to the perception that they are wealthy, especially during evening hours. Criminals continue to target neighborhoods where government leaders, business professionals, aid workers, and foreign diplomats live, despite an increased security presence. . . . . Armed actors can create fake checkpoints in Bangui to collect bribes and impede the work of NGO [non-governmental organization] workers or peacekeeping forces.
>
> . . . .
>
> Civil unrest can develop quickly without prior notice, often interrupting logistics and services.
>
> . . . .
>
> Harassment of foreign nationals is common. Employees of the UN, NGOs, and humanitarian organizations working in contested areas are often targets of crime and/or suspicion by local residents. . . . . Criminals often view non-CAR African nationals and members of NGOs as potential targets for crimes of opportunity due to the perceived affluence of foreigners.

*Central African Republic Country Security Report*, OSAC.GOV (Apr. 7, 2025), https://www.osac.gov/Content/Report/ec7088ab-8d38-4df1-bb99-1c8e3afc6ee5 [https://perma.cc/SZ45-5VMU].

50. This same report also states that local police "suffer from limited resources, a lack of training, illiteracy, and weak command/control structures that make basic policing services rudimentary at best." (*Id.*) In fact, "certain law enforcement officers have been perpetrators of crimes," which "undermines public confidence in law enforcement."

51. The government does not control much of the Central African Republic: "Armed groups . . . control significant swaths of territory throughout the country and act

as de facto governing bodies in those areas, taxing local populations and appointing armed group members to leadership roles."

52. Despite these serious and known risks to foreigners in the Central African Republic, in May 2026, the Deputy Secretary of State, Christopher Landau, informed ICE Director Todd Lyons that the United States had secured a relationship with the government of the Central African Republic by which the Central African Republic agreed to receive deported non-citizens from the United States, as follows:

> I am writing to confirm, consistent with guidance issued by U.S. Immigration and Customs Enforcement on July 9, 2025, that the Department of State has received diplomatic assurances from the Government of the Central African Republic (CAR) that [non-citizens] removed there by the United States will not be persecuted or tortured and that we have determined those assurances to be credible and reliable.
>
> . . . .
>
> The CAR government further assured the United States that it "would treat any third-country nationals transferred from the United States to CAR in a manner that is in accordance with its international obligations and that the third-country nationals removed to CAR would not be subjected to persecution on account of race, religion, nationality, membership in a particular social group, or political opinion or subjected to torture in CAR or any country to which CAR may further transfer the third-country nationals."

(Doc. No. 19-1.)

53. Landau asked Lyons to ensure that this arrangement would remain non-public. (*Id.* at 2 ("Given the highly sensitive nature of our discussions with CAR, I ask that the Department of Homeland Security refrain from publicly discussing our cooperation with CAR on this matter.").)

54. Upon arrival in Bangui, Lopez and other deported non-citizens were ordered off the airplane and into a line on the tarmac, where nurses administered vaccinations for yellow fever and pills for malaria. (Doc. No. 1-6 ¶ 23.)

55. Lopez was not processed by local immigration authorities upon arrival to the Central African Republic. (*Id.* ¶ 24.)

56. Lopez and other deported non-citizens were then taken to an unmarked four-story building, where they were received by personnel from the International Organization for Migration (IOM), an international humanitarian NGO. (*Id.* ¶¶ 23, 25.)

57. Lopez showed Spanish-speaking IOM personnel the injuries he sustained from the rubber bullets. (*Id.* ¶ 26.) Some of those injuries appeared as follows:





(Doc. No. 1-7 at 6, 9.)

58. IOM staff arranged for Lopez to be seen by medical professionals within several days of arrival; he was prescribed medication for pain and inflammation. (Doc. No. 1-6 ¶ 26.)

59. As of the date of Lopez's September 29, 2026 declaration, Lopez has lived with a roommate in an apartment and he believes approximately forty or so other individuals deported from the United States reside in the building, as well. (*Id.* ¶ 25.)

60. The building is guarded by armed personnel around the clock, who have told Lopez and other deported non-citizens that they are not allowed to leave the building. (*Id.* ¶ 27.)

61. Lopez was given a set of building "rules" upon arrival; however, the document is in English. (*Id.*) It is his understanding that it is against the rules to leave the building. (*Id.*)

62. Guards have told deported non-citizens in the building that local police could kill them, make them "disappear," or sell their organs; and that an armed group could kill or kidnap them because they had come from the United States. (*Id.* ¶ 28.)

63. Because of his understanding that it is against the rules to leave the building, and because of what he has been told about the dangers and risks of leaving the building, he has not left since his arrival in Bangui. (*Id.* ¶ 27.)

64. Lopez relies on IOM personnel to deliver him food, water, and other necessities. (*Id.* ¶ 31.)

65. IOM is also assisting Lopez to attempt to obtain his identification documents

from ICE (including his Minnesota REAL ID, his work permit, and other identification documents), which ICE never returned to him. (*Id.* ¶¶ 24, 30.)

66. Lopez has worry and fear about the uncertainty of his life in the Central African Republic; he has no concept of his immigration status within the Central African Republic (if any), including how long he will be permitted to remain in the country, and if or how he can travel to another country. (*Id.*)

67. The Central African Republic may move Lopez to yet another third county. (*See* Doc. No. 19-1 (describing Central African Republic's diplomatic assurances to Department of State officials that deportees will not be persecuted or tortured while in the Central African Republic "or in any country to which CAR may further transfer the third-country nationals").)

68. Lopez fears a situation in which IOM can no longer deliver basic necessities, as he fears leaving his building and has no means by which to make a living in Bangui. (*Id.* ¶ 31.)

69. Lopez also fears becoming sick from malaria and being unable to seek suitable medical care;[5] he has learned that eight other deported non-citizens who arrived in Bangui with him have been hospitalized with malaria since their arrival. (*Id.* ¶ 32.)

---

[5] According to the U.S. Centers for Disease Control, "[m]alaria can be a deadly disease if not diagnosed and treated quickly" and that prompt care "can often prevent severe illness and death." *About Malaria*, CDC.GOV, https://www.cdc.gov/malaria/about/index.html [https://perma.cc/DGV6-VRQ7] (last visited October 30, 2026).

**D. This Action**

70. On October 16, 2026, Lopez filed this civil action. (Doc. No. 1.)

71. In his five-count Complaint, Lopez asserts that Defendants violated the Administrative Procedure Act (APA) and the Fifth Amendment to the U.S. Constitution in several ways; specifically, he asserts that Defendants violated the APA and the *Accardi* doctrine by removing him from the United States without first following applicable DHS regulations (specifically 8 C.F.R. §§ 208.31, 241.8(e)–(f), 1208.31) meant to determine whether he had reasonable fear of being removed to the Central African Republic (Count I); Defendants violated his rights to procedural due process under the Fifth Amendment by purporting to revoke his OSUP, not conducting a reasonable fear interview or otherwise be heard on any claim for protection (Count II); Defendants violated the APA and the *Accardi* doctrine by revoking his OSUP without providing the process required by applicable DHS regulations (specifically 8 C.F.R. § 241.4(l), 241.13(i), 241.13(j)) (Count III); Defendants violated the APA by removing him from the United States in violation of 8 U.S.C. § 1231(b)(3) (Count IV); and that Defendants violated the APA and the Fifth Amendment by retaining identification documents after removal (Count V). (Doc. No. 1 ¶¶ 133–68.)

72. In his Prayer for Relief, Lopez seeks, among other things, a declaration that (1) Defendants' removal of Lopez to the Central African Republic without notice or process violated DHS regulations and the Fifth Amendment, and (2) Defendants' purported revocation of Lopez's OSUP was in violation of DHS regulations. (Doc. No. 1 at 36.) They also seek an order requiring Defendants to facilitate Lopez's return to this District and, once returned, to place him back on his OSUP and to handle his case as they would

have if he had not been sent to the Central African Republic. (*Id.* at 36–37.) He also seeks an injunction such that Defendants cannot deport Lopez to any country other than Nicaragua without prior written notice. (*Id.* at 37.)

73. On October 22, 2026, Lopez filed a motion for preliminary injunction and requested expedited handling. (Doc. No. 7.)

74. On October 23, 2026, the Court ordered Defendants to file a response on or before 11:00 a.m. on October 27, 2026. (Doc. No. 13.)

75. Defendants filed a timely response to the motion. (Doc. Nos. 18–21.)

76. Lopez filed a timely reply brief in support of his motion. (Doc. No. 27.)

77. The matter came before the Court for argument on October 30, 2026, at 1:00 p.m. (Doc. No. 28.) Neither party took testimony or otherwise supplemented the factual record during the hearing. (*Id.*)

## DISCUSSION

Lopez now moves for emergency injunctive relief. Specifically, he asks the Court to "direct[ ] Defendants to facilitate [his] return to the United States and to ensure that his case is handled as it would have been had he not been improperly removed" to the Central African Republic. (Doc. No. 7 ¶ 1.)

When considering a motion for a preliminary injunction, courts consider the following four familiar *Dataphase* factors: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d

109, 114 (8th Cir. 1981). No one factor is determinative and courts "flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene." *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir. 1999) (quotation omitted). The primary purpose of a preliminary injunction is to preserve the status quo until the merits of a party's claim can be determined. *Dataphase*, 640 F.2d at 113. The status quo is "the last uncontested status which preceded the pending controversy." *Minn. Min. & Mfg. Co. v. N.L.R.B.*, 385 F.2d 265, 273 (8th Cir. 1967). Here, the status quo is the status that existed prior to January 15, 2026, when Defendants took Lopez into custody.

The moving party—here, Lopez—bears the burden to establish these factors. *E.g.*, *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). The Court concludes that Lopez met his burden and all four factors favor granting a preliminary injunction.

### A. Threat of Irreparable Harm

The first *Dataphase* factor asks whether Lopez has demonstrated that he will suffer irreparable harm while his claims are pending absent the requested injunctive relief. *Dataphase*, 640 F.2d at 114. Given the evidence presented, this factor heavily favors granting the preliminary injunction.

Defendants argue that Lopez has not made the requisite showing on this factor because "[h]e does not allege that he has been or is being persecuted or tortured in the [Central African Republic]." (Doc. No. 18 at 44.) Defendants appear to confuse the standard for obtaining asylum with the standard for analyzing the irreparable-harm factor. Irreparable harm can be harm—not literal persecution or torture—that is either "actual or

threatened." *St. Jude Med., Inc. v. Carter*, 913 N.W.2d 678, 684 (Minn. 2018). It "occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). To carry his burden on this factor, Lopez must show that "irreparable injury has resulted, or will in all probability result," and that "[t]he threatened injury [is] real and substantial" as a result of Defendants' revocation of his OSUP without the process he was due under DHS regulations or the Constitution. *St. Jude Med.*, 913 N.W.2d at 684 (quotations omitted).

Here, the threat of irreparable harm to Lopez of remaining in the Central African Republic while his claims are pending is self-evident and was known to Defendants well before they ever forced Lopez (with quickly developing bruises and welts) onto a flight to the Central African Republic. Defendants relocated Lopez to an unstable country that they affirmatively knew to have corrupt and ineffective law enforcement and where residents are at the mercy of armed criminal groups. Lopez has no legal status in the Central African Republic and no means by which to provide for himself. He cannot leave the guarded building in which he lives due to the very real threat of serious bodily harm or worse. Further, Lopez depends entirely on an international aid organization for his basic necessities, and the operations of that organization are known to Defendants to be frequently subject to interruptions due to sudden flares of civil unrest. Further, he is at risk of contracting potentially deadly diseases (as have some of his deported non-citizen building-mates) and has no access to suitable medical care.

The Department of State warns employees and private-sector partners to "not travel

to the Central African Republic for any reason," that "criminals frequently target foreigners for crimes of opportunity due to the perception that they are wealthy" and that such criminals "target neighborhoods where government leaders, business professionals, aid workers, and foreign diplomats live, despite an increased security presence"; that "criminal or terrorist individuals or groups have threatened to and/or have seized or detained and threatened to kill, injure, or continue to detain individuals in order to compel a third party (including a governmental organization) to do or abstain from doing something as a condition of release"; that "[h]arassment of foreign nationals is common"; and that "[c]riminals often view non-[Central African Republican] [ ] nationals and members of NGOs as potential targets for crimes of opportunity due to the perceived affluence of foreigners." *Central African Republic*, *supra* at 9; *Central African Republic Country Security Report*, *supra* at 10. According to the Department of State, local police services are weak, lack resources, and are "rudimentary at best."[6] *Id.* Moreover, the evidence presented includes no indication that any diplomatic assurances related specifically to the grave dangers known to the Department of State. The Court also observes that Defendants' own correspondence requires DHS officials to keep the arrangement with the Central African Republic a secret. (Doc. No. 19-1 at 2.) The Court is left to presume the reason

---

[6] The evidence presented does not indicate specifically who in the Central African Republic is making diplomatic assurances to the United States. Because the Department of State believes that much of the country is not controlled by the official government, but instead by armed groups and opposition forces (*see Central African Republic Country Security Report*, *supra* at 10 (explaining that "[a]rmed groups . . . act as de facto governing bodies"), it remains unclear whether the assurances include the part of the country outside of the control of the official Central African Republic government.

for asking DHS to refrain from making the arrangement public; perhaps it is because they do not want the general public to know that they have agreed to forcibly relocate prisoners to a country in which foreign nationals will be subject to the known and serious danger. Finally, by not presenting any evidence that these dangers were considered by DHS, Defendants' current argument that Lopez—a vulnerable western foreigner in the Central African Republic who arrived from the United States—does *not* face any risk of concrete or imminent harm is plainly disingenuous.[7]

While he remains in the Central African Republic, Lopez is a target for violent criminals. He cannot leave the Central African Republic for lack of status, he depends on the charity of a third party to survive, and he fears bodily harm if he goes outside (essentially, he remains in a quasi-carceral setting even though he is no longer detained by ICE). He has established that he is at risk of irreparable harm if he remains in the Central African Republic while this lawsuit is pending. *E.g.*, *Abrego Garcia v. Noem*, 777 F. Supp. 3d 501, 518 (D. Md. 2025) (concluding that plaintiff demonstrated clear threat of irreparable harm when Defendants sent him to a carceral setting that invited harm to him). This first *Dataphase* factor weighs heavily in Lopez's favor.

[7] In addition, the Court acknowledges that Defendants' legal arguments, if correct, would result in the creation of an unreviewable circumvention of legal procedures, as nothing prevents the Central African Republic from removing Lopez to Nicaragua. Certainly, Congress did not intend for an administrative agency to render asylum law optional or obsolete. *See West Virginia v. EPA*, 597 U.S. 697, 721–23 (concluding that "clear congressional authorization" must exist for the power an agency claims when history and the breadth of authority "provide a 'reason to hesitate before concluding that Congress' meant to confer such authority") (citations omitted).

### B. Probability of Success on the Merits

The next *Dataphase* factor requires the Court to consider how likely it is that Lopez will prevail on the merits of his claims. *Dataphase*, 640 F.3d at 114. At this stage, the inquiry is not whether Lopez will ultimately prevail; rather, the Court asks whether he has "demonstrated a reasonable probability of success, that is, a fair chance of prevailing on the merits of [his] claims." *CEZ Prior, LLC v. 755 N Prior Ave. LLC*, 126 F.4th 1353, 1358 (8th Cir. 2025) (quotation omitted); *see also Dataphase*, 640 F.3d at 113.

In Count III and in part of Count II, Lopez asserts that Defendants violated the Fifth Amendment, the APA, and the *Accardi* doctrine when they detained him without following regulations promulgated and having the force of law regarding revocation of an OSUP. On the relevant undisputed facts, Lopez is likely to succeed on these claims. This factor weighs heavily in Lopez's favor.

It should go without saying that government agencies are required to follow their own regulations. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954); *Sarail A. v. Bondi*, 803 F. Supp. 3d 775, 779 (D. Minn. 2025). Specific regulations control the federal government's ability to detain, release, and revoke the release of noncitizens subject to orders of removal. For example, 8 C.F.R. § 241.13 governs when ICE wishes to revoke an OSUP previously issued to a non-citizen on a determination that there was no significant likelihood the non-citizen would be removed in the reasonably foreseeable future.[8] *Id.* § 241.13(g).

[8] In their briefing, Defendants argue that the Court lacks jurisdiction pursuant to 8 U.S.C. § 1252(g) over some of Lopez's claims—specifically, the APA and Due Process claims

Defendants can revoke release pursuant to section 241.13 on only two grounds: (1) upon a violation of supervised release, or (2) upon DHS's showing of changed circumstances. *Id.* § 241.13(i). Under the latter, ICE "may revoke [a noncitizen's] release under this section and return the [noncitizen] to custody if, on account of changed circumstances, [ICE] determines that there is a significant likelihood that the [noncitizen] may be removed in the reasonably foreseeable future." *Id.* § 241.13(i)(2). To make such a reasoned determination, the agency must "consider[] factors probative of the [noncitizen's] future removal," such as the factors set out in section 241.13(f). *Sarail A.*, 803 F. Supp. 3d at 785 (citing cases); *see also Kong v. United States*, 62 F.4th 608, 620 n.13 (1st Cir. 2023) (referring to the factors in subsection (f) as relevant to the subsection (i)(2) determination governing re-detention of a noncitizen released under section 241.13). These factors include, but are not limited to, the history of Lopez's efforts to comply with the order of removal, the history of ICE's efforts to remove non-citizens to third countries that are an option for Lopez's removal, the reasonably foreseeable results of those efforts, and the views of the Department of State regarding the prospects for removal of non-citizens to the countries in question.[9] *See* 8 C.F.R. § 241.13(f).

---

concerning the decisions to relocate Lopez to the Central African Republic. (Doc. No. 18 at 20–23.) They do not argue—nor can they because the Court is aware of no authority supporting the proposition—that section 1252(g) bars the Claims in Counts II and III regarding revocation of the OSUP. *See United States v. Hunt*, 169 F.4th 766, 772 (8th Cir. 2026) (concluding party waived issue not raised).

[9] 8 C.F.R. section 241.4 separately requires a lawful basis for revocation, notice of the reasons, a prompt informal interview, and individualized custody review. *See Folashade O. v. Schilling*, No. 26-CV-2705 (LMP/DTS), 2026 WL 1734877, at *2 (D. Minn. Jun. 16, 2026) (finding that the parties' "briefing referred to 8 C.F.R. § 241.13(i)" but "the record

In either case—violation of supervised release or changed circumstances—the regulations require ICE to notify the noncitizen "of the reasons for revocation of his or her release" and to conduct an initial informal interview promptly to afford the noncitizen an opportunity to respond to the reasons for revocation stated in the notification. *Id.* § 241.13(i)(3). ICE must then conduct a "revocation custody review," which includes "an evaluation of any contested facts relevant to the revocation and a determination whether the facts as determined warrant revocation and further denial of release." *Id.* Section 241.13 places the burden on ICE to establish that "changed circumstances" justified the revocation of release. *Roble v. Bondi*, 803 F. Supp. 3d 766, 772 (D. Minn. 2025); *Escalante v. Noem*, No. 25-CV-182 (MJT/CLS), 2025 WL 2206113, at *3 (E.D. Tex. Aug. 2, 2025); *Nguyen v. Hyde*, 788 F. Supp. 3d 144, 150 n.2 (D. Mass. 2025).

Here, the record does not contain sufficient, if any, evidence showing that Defendants considered the factors listed in sections 241.13(f) or 241.4 prior to making the initial determination to detain Lopez. Defendants have offered no reasons at all for detaining Lopez, whether in a notice to him or in written submissions in this action, nor have they submitted any relevant documentation as to the travel documents that a proper revocation requires. The record contains no evidence that a Notice of Revocation was ever

---

reflects the Government invok[ing] . . . 8 C.F.R. § 241.4(l)"). The Court concludes that, on this record, the Defendants did not consider the factors required by either 8 C.F.R. sections 241.13 or 241.4. *See Kong L. v. David Easterwood, et al.*, No. 26-CV-3669 (LMP/LIB), 2026 WL 2824325, at * 4 (D. Minn. Sept. 21, 2026) (finding that "noncitizens who have their OSUP revoked under 8 C.F.R. § 241.13(i)(3) receive the 'custody review' process provided in 8 C.F.R. § 241.4" (citations omitted)).

issued, much less that Lopez ever received notice of his revocation.[10]

Nothing in the record suggests changed circumstances or that Lopez would have been removed in the reasonably foreseeable future, nor that ICE made any reasoned determination to detain Lopez. Instead, the record shows that (1) Lopez established that he complied with the conditions of his OSUP (Doc. No. 1-6 ¶ 4); (2) Defendants did not have a plan (i.e., travel documents) to remove Lopez in the reasonably foreseeable future at the time of revocation—instead, after arresting him, Lopez was shuffled between four detention camp facilities in Texas and Louisiana over the course of seven-and-a-half months while being told he would be deported to Nicaragua, Mexico, and, finally, to the Central African Republic.[11] (*Id.* ¶¶ 11, 15–16, 29.)

Importantly, Defendants do not contest the factual statements concerning the violations of sections 241.4(l), 241.13(i),(j), or the failure to provide any process at all concerning the OSUP. For instance, Defendants concede in their response that the notification requirement of section 241.13(i)(3) applies (Doc. No. 18 at 39), but they neither suggest nor provide documentation that they complied or even attempted to comply with this requirement. The only argument presented concerning the claims in Counts II

---

[10] The record contains only a copy of Lopez's OSUP (Doc. No. 1-3) without any evidence of a notice of revocation or any further documentation. Instead, with respect to the regulatory violations, Defendants merely say that "[t]he state of the record as to these issues is unclear as of the time of this filing." (Doc. No. 18 at 40 n.8.)

[11] Defendants could have—but did not—include in the factual record any documents evidencing the dates that Defendants obtained travel documents for his proposed deportations to Nicaragua, then Mexico, and ultimately the Central African Republic.

and III regarding the OSUP is that "the circumstances surrounding Plaintiff's revocation of his OSUP are moot." (Doc. No. 18 at 4.) However, Defendants point to no authority—and the Court is aware of none—for the proposition that a deportation (such as the wrongful deportation alleged here) renders moot a claim that ICE violated constitutional due process, statutory requirements, and regulatory requirements. Nor is there any legal authority suggesting that a deportation cures a wrongful detention.[12]

For these reasons, Lopez has shown that he likely will prevail on the merits of his claims that Defendants violated the APA, constitutional Due Process and their own regulations when they took Lopez into custody without following applicable procedures to revoke the OSUP.[13] *See Hoac v. Becerra*, No. 25-CV-01740 (DMC/JDP), 2025 WL

---

[12] The only case cited by Defendants concerning their position that Lopez's argument regarding his OSUP is *Puc-Ruiz v. Holder*, 629 F.3d 771 (8th Cir. 2010). (Doc. No. 18 at 40.) However, this case does not support the proposition that deportation renders moot previous violations of Due Process, the INA, and regulatory provisions. Instead, this case merely explains an evidentiary rule applicable in immigration court proceedings. Absent some authority to support its legal argument, the Court is not persuaded to create a new rule of law incentivizing deportation of every person unlawfully detained (citizen or not) by Defendants to evade accountability for the unlawfulness of the arrest or detention.

[13] Defendants argue that this District is the wrong venue for adjudicating Lopez's claims and that Louisiana would be a more suitable venue because that was the district of Lopez's confinement at the time of his removal. (Doc. No. 18 at 29–30.) The Court disagrees on factual and legal grounds. First, Defendants' argument conflicts with the undisputed factual record, which shows that Lopez was in his fourth detention camp facility in Texas, not Louisiana, immediately before his removal from the United States. Second, this action is not a habeas action, and the Court is not required to analyze the venue question by reference to the district of confinement. Any case involving federal-question jurisdiction may be filed in a "judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(b)(2). Venue is "proper in any number of districts, provided only that a substantial part of the events giving rise to the claim occurred there." *See Woodke v. Dahm*, 70 F.3d 983, 985 (8th Cir. 1995). The Court makes no determination of the likelihood of success of any of Lopez's claims except for

1993771, at *3–5 (E.D. Cal. Jul. 16, 2025) (finding that Petitioner was likely to succeed on the merits of "his claim that Respondents did not properly revoke his release pursuant to § 241.13" when Respondents failed to timely provide Petitioner with an initial interview and could not demonstrate changed circumstances); *Roble*, 803 F. Supp. 3d at 772 (holding that Petitioner was entitled to habeas relief when the government did not meet section 241.13's revocation of release standard because it is "on ICE to first establish changed circumstances that make removal significantly likely in the reasonably foreseeable future"); *Sarail A.*, 803 F. Supp. 3d at 784 (granting habeas relief under section 241.13 because "ICE failed to properly determine a significant likelihood of removal in the reasonably foreseeable future"); *Jor Y. v. Mullin*, No. 26-CV-3722 (JMB/DJF), 2026 WL 2531850, at *4 (same).[14]

### C. Balance of Harms and Public Interest

The final *Dataphase* factors ask the Court to balance the risk of irreparable harm to

---

his claims regarding the OSUP. Further, agents in Minnesota supervised Lopez under his OSUP until the time of his January 2026 arrest. Because the entirety of this claim (which comprises a substantial part of the lawsuit) occurred in Minnesota, venue is proper here.

[14] For purposes of the preliminary injunction motion, the Court need not address Lopez's probability of succeeding on his remaining claims. *Minnesota Min. & Mfg. Co. v. Taylor*, 21 F. Supp. 2d 1003, 1004 (D. Minn. 1998) ("A preliminary injunction is appropriate if any one of a plaintiff's claims supports such relief."). At the request of either party, and at the appropriate time, the Court will consider whether to stay, sever, dismiss, or transfer the claims that are sufficiently similar to those in *D.V.D. v. U.S. Dep't of Homeland Sec.*, 821 F. Supp. 3d 102 (D. Mass. 2026), *aff'd in part, vacated in part*, No. 26-1212, 2026 WL 2797801 (1st Cir. Sept. 18, 2026), and *cert. granted sub nom. Dep't of Homeland Sec. v. D.V.D.*, No. 26-426, 2026 WL 2917860 (U.S. Sept. 29, 2026), as to warrant such treatment. *See Cameron v. Tomes*, 990 F.2d 14, 17 (1st Cir. 1993) (citing *Cooper v. Federal Reserve Bank of Richmond*, 467 U.S. 867, 880 (1984) (concluding that class action judgments are limited only to the claims at issue and do not impact a plaintiff's ability to raise individual claims not addressed in the class action).

Lopez in the absence of injunctive relief against any harm to Defendants if this motion was granted. *Dataphase*, 640 F.3d at 114. The Court must also consider whether the requested relief is in the public interest. *Id.*

These factors, too, weigh in Lopez's favor. The public interest is always served by requiring Defendants to comply with their own regulations. *See Orellana Quintanilla*, 836 F. Supp. 3d 591, 606 (D. Md. 2026); *R.I.L.R. v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) ("The public interest is served when administrative agencies comply with their obligations under the APA." (citation omitted)). Defendants argue that "[t]he government has a compelling interest in the steady enforcement of its immigration laws" (Doc. No. 18 at 46), a proposition with which Lopez agrees and on which he premises his entire lawsuit. Aside from the expense of Lopez's transportation back to the United States, Defendants are not harmed by an order requiring Lopez's return to the United States to be given the process he was likely due nearly ten months ago. *Nebraska v. Biden*, 52 F.4th 1044, 1047 (8th Cir. 2022) ("[T]he equities strongly favor an injunction considering the irreversible impact [the challenged agency] action would have as compared to the lack of harm an injunction would presently impose.").

Therefore, on balance, the *Dataphase* factors tip in Lopez's favor, and the Court grants the motion.[15]

---

[15] The Court determines that a bond under Federal Rule of Civil Procedure 65(c) is not necessary because this matter is closely associated with important public interests. *See, e.g.*, *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016).

**ORDER**

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT Plaintiff Kenis Lopez Gonzalez's Motion for a Preliminary Injunction (Doc. No. 7) is GRANTED, as follows:

1. Defendants shall arrange for and facilitate Lopez's return to the United States from the Central African Republic by taking all reasonable steps within their control to do so, including the following:[16]

   a. An ICE/ERO Deportation Officer (DO) shall contact Lopez's attorney as soon as practicable and in any event before 11:00 a.m. on Wednesday, November 4, 2026, to obtain any information necessary to designate Lopez's mode and location of entry and any other itinerary details needed for the DO to complete a form for Significant Public Benefit Parole (SPBP).

   b. On or before 11:00 a.m. on Friday, November 6, 2026, a DO shall submit a request to authorize Lopez's entry into the United States via SPBP.

   c. Within 5 business days of submission of the SPBP request for Lopez to the DO, the applicable Group Supervisor, Assistant Special Agent in Charge, Deputy Special Agent in Charge, the Special Agent in Charge, the Regional Attache, the ERO Parole Coordinator, the ERO Field Officer Director, the Parole & Law Enforcement Programs Unit Adjudicator, and the Parole & Law Enforcement Programs Unit Program Manager shall approve the request.

   d. The Port of Entry Chief and Lopez's counsel shall be promptly advised of the date and time of Lopez's arrival.

   e. Department of State employees and agents at the U.S. Embassy in the Central African Republic or any other embassy or consulate working in partner with the embassy in the Central African Republic shall issue the parole letter and inform Lopez how the parole letter shall be used in transit from the Central African Republic to the United States.

---

[16] The Court relies on the Declaration of James Van Der Vaart, which includes an explanation of the process for facilitating Lopez's return. (Doc. No. 21.)

f. To whatever extent necessary to expeditiously facilitate Lopez's return to the United States, employees and agents at the U.S. Embassy in the Central African Republic or any other embassy or consulate working in partner with the embassy in the Central African Republic, or other applicable Department of State officials, shall coordinate with applicable DHS officials (including U.S. Customs and Border Patrol) and/or Lopez's counsel. At least one day before Lopez's arrival at the Port of Entry, Department of State employees or agents in the U.S. Embassy in the Central African Republic shall inform U.S. Customs and Border Patrol Officers at the Port of Entry that Lopez will attempt to enter without a passport or other government-issued identifying documents.

g. The Port of Entry Chief shall permit Lopez's entry into the United States, notwithstanding his lack of passport and other government-issued identifying documents.

h. U.S. Customs and Border Patrol Customs Officers at the Port of Entry shall permit Lopez's entry to the United States on his parole letter, notwithstanding his lack of passport and other government-issued identifying documents.

i. Defendants shall return Lopez to the District of Minnesota and shall thereafter not remove him from the District while this matter is pending.

2. Defendants shall bear the cost of Lopez's travel and return to Minnesota from the Central African Republic.

3. Defendants shall restore Lopez to the conditions of the OSUP in effect before his detention on January 15, 2026, and Defendants shall not revoke his OSUP or otherwise detain him except in compliance with all statutory and regulatory requirements, including 8 C.F.R. §§ 241.14(l) and 241.13(i).

4. Defendants shall return to Lopez any and all property taken by ICE during and after his January 15, 2026 arrest, including any government-issued licenses, identification documents, or permits. In the event that Defendants claim any of Lopez's documents or property has been lost, Defendants must submit the following five items: (1) a full list of the property at issue, including Forms I-77, I-216, and G-589 related to Lopez's detention; (2) an acknowledgment of Defendants' inability to locate the property in question; (3) an acknowledgement that there are no additional steps that Defendants can take to locate the property in question; (4) an agreement that, on or before December 31, 2026, Defendants will compensate Lopez for the value of the

lost property; and (5) if applicable, an agreement that, on or before December 31, 2026, Defendants will replace or provide certified copies of lost work authorization or other documents issued by the federal government.

5. On or before 11:00 a.m. on Friday, November 6, 2026, and every seven days thereafter until Lopez's return to the United States or further order of the Court, Defendants shall meet and confer with Lopez's counsel and file a joint status report, supported by a declaration from an official with personal knowledge, stating: (a) the information known to Defendants about Lopez's current location, custodial status, and physical condition; (b) the steps Defendants have taken since the prior report to comply with paragraph 1; and (c) the further steps Defendants intend to take and the anticipated timeline.

6. No security is required under Federal Rule of Civil Procedure 65(c).

7. This Order is preliminary. It is entered without prejudice to any claim, defense, or request for further relief in this action. Nothing in this Order shall be construed to, and does not, adjudicate the validity of the IJ's order for Lopez's removal or withholding of removal or DHS's policy of third-country removals.

8. To prevent further harm, at all times before and after Lopez's return to the United States, Defendants and their officers and agents are prohibited from shooting Lopez with rubber bullets or any other projectiles at close range or otherwise.

Dated: October 30, 2026

/s/ *Jeffrey M. Bryan*
Judge Jeffrey M. Bryan
United States District Court